UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                 **MEMORANDUM AND ORDER**

    - against -                                         11-CR-722 (S-4) (RRM)

ESVIN LEONEL MONZON-LUNA,

                Defendant.
----------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge

       Defendant Esvin Monzon-Luna was indicted on charges of sex trafficking of children, transportation of illegal aliens for financial gain in violation, and related charges. Before the Court is defendant's motion to suppress physical evidence and statements obtained as a result of a December 5, 2011 encounter with agents of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") ultimately leading to defendant's arrest. In addition to receiving full briefing on the matter, the Court held a suppression hearing during which Special Agents Michael Ortiz, Thomas Kirwin, and Elvin Hernandez; Intelligence Operations Specialist Benny Tirado; and Group Supervisor Keith Kolovich, all members of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), testified.[1]

       For the reasons set forth below, defendant's motion to suppress is denied in its entirety.

---

[1] The Court notes at the outset that each of these agents is a highly-experienced law enforcement professional, having participated and, in the case of Kolovich supervised, numerous investigations and arrests. The Court observed the demeanor of each witness, had occasion to observe their testimony in the first instance, and then review that testimony. In reaching the conclusions herein, the Court finds each of the witnesses wholly credible.

## I. Findings of Fact

Agents Thomas Kirwin and Michael Ortiz, both members of the HSI's Human Smuggling and Trafficking Unit, were assigned to locate a female minor victim of sex trafficking who allegedly had worked in prostitution. As part of the investigation, HSI had obtained GPS tracking orders for two telephones that the agents believed would be in the possession of either the minor victim or an individual who would be with her. The GPS warrants yielded information suggesting that the phones were located in a specific area, early in the morning. Based on this information, the agents planned to go to the location, armed with a photo of the minor victim, in the hopes of locating the victim on the street.

On the morning of December 5, 2011, the agents went to the target location, an apartment building located in Queens on 108th Street between 39th and 40th Avenues, to conduct surveillance with the goal of locating the victim. The building housed a bodega on the ground floor, and the agents unsuccessfully attempted to enter the apartment building through the bodega.

At approximately 12:30 p.m., after conducting surveillance of individuals and vehicles near the building, the agents noticed a woman, later identified as Araceli Acastelano, who unloaded groceries from her car and was proceeding to the apartment building. Kirwin and Ortiz approached Acastelano. They told her that they were "police" and were looking for an individual who had stolen a cell phone and who they believed was hiding behind the building. They explained that they wanted to gain entry to the building's roof to check, and asked for her permission to accompany her into the building. Acastelano agreed, and the agents followed her to the door of an apartment on the second floor.

There, the agents asked whether the apartment was hers and asked for permission to enter it. Acastelano acknowledged that the apartment was hers and agreed to allow the agents to enter. Inside the apartment, Acastelano told Kirwin and Ortiz that in order to view the rear of the building, they would need to enter a particular room in the apartment, but she had rented that room out to a male who was living with a female from Mexico, and would need his permission in order to gain access to that room.

Acastelano then went over to the room and knocked on the door. The defendant opened the door. Acastelano said something to defendant which the agents did not hear. Kirwin and Ortiz identified themselves as police.[2] Ortiz, a native Spanish speaker, explained that they were looking for an individual who stole a cell phone and were hoping to look out of his rear window to see if the individual was hiding behind the building.[3] Ortiz asked for permission to enter the room, and defendant told the agents that they could enter. The defendant led Kirwin over to the window. Defendant explained that they would not be able to see down into the rear of the building from the window since there was a separate roof in the rear, but that they could climb onto that roof to view behind the building. Defendant started moving objects away from the window to facilitate the agent's exit through the window. Kirwin thanked defendant for being so helpful, shook the defendant's hand, and introduced himself as "Tom." Defendant replied that his name was "Edwin" and that he was from Mexico. Kirwin then climbed onto the roof where he remained for 10 to 15 seconds, and returned to the room

Kirwin explained to defendant that he was not able to find the missing cell phone and that they would need to prepare a report of their work for their superiors. Kirwin asked for the

---

[2] As the agents explained, they did not identify themselves as immigration agents, preferring to use the generic term "police" as that term is universally understood, and to facilitate their ruse.

[3] Kirwin spoke to the defendant in English. Ortiz, a native Spanish speaker, spoke directly to the defendant in Spanish, and translated Kirwin's statements into Spanish.

3

defendant's identification so that he could include it in the report and so that his superiors would know that Kirwin and Ortiz had actually conducted an investigation. The defendant agreed and handed Kirwin with what purported to be a Guatemalan identification card baring the name "Bariel Gutierrez." Kirwin noted for defendant the discrepancy between the information on the ID, and the name and nationality defendant gave when he introduced himself, and said they often encountered illegal aliens on the street who use these ID's just to get work. Kirwin suggested to defendant that he didn't really mean to give Kirwin a false ID, and in response, defendant admitted that he was in the United States illegally.

Kirwin explained that the agents still needed to complete their report and might need to contact the defendant in the future, and asked if defendant had a phone. Defendant indicated that he did have a phone, which was in his hand. In light of the discrepancies with the identification document, Kirwin asked to see the phone in order to verify the phone number for the report. The defendant agreed and gave Kirwin the phone (the "516-phone"). Kirwin "flipped through" the phone for seconds, looking for its number and any information related to the minor victim; at the same time, the defendant himself provided its phone number as (516) 661-1116. The agents recognized this number as one for which they had obtained a GPS tracking warrant.

Kirwin also noticed that the defendant was holding notebook in his hand. Kirwin asked to see the notebook, and defendant agreed, handing it to the agent. Kirwin flipped through it, noticed an email address beginning with "EsvinMonzon."

At this point, approximately 1:00 p.m., Kirwin and Ortiz identified themselves as Homeland Security agents, and again asked the defendant whether he was in the country illegally. Defendant admitted that he was, and the agents placed the defendant under administrative arrest. The defendant was handcuffed and eventually searched, revealing a

4

second cell phone later identified as a Blackberry bearing a 203 telephone number (the "203-phone"), and the second phone for which the agents had obtained the GPS tracking warrant. Also visible on the bed in the room was a third cell phone, which the agents seized. [4]

As the agents testified, the defendant's room was small, and at no time during the entire encounter between the agents and defendant did the agents walk around the room, or conduct any search of the room or its contents. Other than Agent Kirwin's walk to and exit through the window, the agents and the defendant stood close by one another, and had very little room to move around during the course of the encounter. As they further described, defendant was at all times cordial and cooperative.

Following his arrest, defendant was transported to HSI's office in Manhattan. There, defendant was interviewed by Kolovich, with Tirado serving as the translator, and Hernandez joining the interview for a period of time. [5] Defendant was not handcuffed and he was provided with water.

The agents testified that defendant was then given his *Miranda* rights before any questioning. Using an advice of rights form written in Spanish, Tirado, in Spanish, read to defendant each line of the form and asked him write his initials after each line if he understood. Defendant wrote his initials after every line, and signed his name acknowledging the waiver of those rights. After defendant waived his *Miranda* rights, the Kolovich, with Tirado, proceeded to question him.

---

[4] The government does not seek to introduce any evidence from this third phone. (*See* Doc. No. 131 at 4.) Thus, defendant's motion to suppress as to this phone is moot. Thus, any further references to "phones," therefore, refers only to the 516-phone and the 203-phone, evidence from which the government seeks to introduce at trial.

[5] Kolovich led the interview and spoke in English. Hernandez and Tirado, both native Spanish speakers, spoke to the defendant in Spanish, and translated Kolovich's questions to the defendant from English to Spanish.

5

The agents first inquired about the defendant's identity. Defendant initially indicated that his name was Bariel Gutierrez, but after further inquiry, defendant admitted his name was Leonel Monzon-Luna.

Defendant was asked about the phones that were taken from him. Defendant stated that the 516-phone was his and that he knew the phone number, but that he did not know the number or the carrier of the other phone. Hernandez then brought into the room a bag containing two phones, both the 516-phone (a Nokia) and the 203-phone (a Blackberry). [6] Hernandez placed the phones in front of defendant and asked whether those phones were his. Defendant replied that they were. Hernandez then asked defendant whether the agents could search those two phones. Defendant stated that they could. All three agents – Kolovich, Tirado and Hernandez – testified that defendant orally gave his consent to search both phones that were brought into the room. Tirado then provided the defendant with a consent to search form in Spanish. The defendant himself filled in the space for his name and signed the form. Tirado filled in all the spaces on the form bearing the description of the phone. As the agents acknowledged, the consent to search form only lists "un telephono" – " a telephone" in the singular − and not "los telephonos" − telephones in the plural − and contains only the 516 telephone number and "Nokia" as the model.

According to both Tirado and Hernandez, the 203-phone was not listed on the consent to search form because defendant could provide no identifying information about the phone and adding that phone would require adding information that did not come directly from the defendant. Hernandez testified that he knew that these two phones were both the 516-phone and the 203-phones that were the subject of the GPS tracking warrants because while the phones were in the HSI office, the "pings" for the phones were coming back to that very office.

---

[6] Tirado testified that only two phones were brought into the room, a Nokia and a Blackberry, and was unaware that there was a third phone involved.

Hernandez ultimately left the room to conduct the search of the phones. Kolovich and Hernandez both testified that had there been any doubt as to defendant's consent to search the two phones, they would have secured a search warrant to so do.

As the agents testified, throughout the interview, the defendant was cooperative and calm, appeared to understand what was happening, and never asked for a lawyer. At no time did any of the agents tell defendant that he was being held indefinitely on criminal or immigration charges, or suggest to him that he could help himself by being truthful.

## II. Conclusions of Law

Defendant moves to suppress statements made by defendant to law enforcement officials inside his residence, the 516- and 203-phones as well as the notebook obtained during the encounter at his residence, and his post-arrest statements. In essence, defendant claims that the initial entry into defendant's residence, obtained by ruse, violated his Fourth Amendment rights, thereby requiring suppression of all physical evidence and statements obtained both while in defendant's residence and after his arrest, as well as any fruits thereof. Moreover, defendant claims that he did not voluntarily consent to the search of the 203-phone, and that the search thereof exceeded the bounds of the consent given. For the reasons set forth below, the Court disagrees, and denies defendant's motion in its entirety.

### a. Use of a Ruse

A warrantless search, although generally considered unreasonable, is permissible under the Fourth Amendment if conducted on the basis of consent of an authorized person. *Schneckloth v. Bustamonte*, 412 U.S. 218, 245 (1973); *United States v. Lopez*, 547 F.3d 397, 398 (2d Cir. 2008); *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004) (recognizing that "where authorized party consents to search 'neither a warrant nor probable cause is necessary'").

7

Where, as here, the Government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). Courts look to the totality of the circumstances to determine whether the "consent was 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)). "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Id*. (citing *Schneckloth*, 412 U.S. at 228). The search must not exceed the scope of the consent given, and is measured under the standard of "objective reasonableness": that is, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Garcia*, 56 F.3d at 423 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). As such, a search will be deemed reasonable when, "under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to conduct the search that was undertaken." *Id*. (citing *Jimeno*, 500 U.S. at 249 (internal brackets and quotations omitted)).

"It is well-established that 'in the detection of many types of crime, the Government is entitled to use decoys and conceal the identi[t]y of its agents.'" *United States v. Alejandro*, 368 F.3d 130, 136 (2d Cir. 2004) (quoting *Lewis v. United States*, 385 U.S. 206, 209 (1966)). Thus, the use of trickery and deception by law enforcement officers "does not itself require or preclude a finding that an authorized person voluntarily consented to a search. Rather, the totality of all circumstances – including, naturally, the nature of the deception used – must still be considered in determining whether such consent was voluntarily given." *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 290 (S.D.N.Y. 2008) (quotations and citations omitted).

8

Where "the police misrepresentation of purpose is so extreme, a person is deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy," however, "the resulting consent should not be considered valid." *Id*. (quoting Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed. 2007)). For example, in *Montes-Reyes*, the defendant allowed law enforcement officers claiming to be searching for a missing girl to enter his room in order to look for the child. *See* 547 F. Supp. 2d at 283. Upon entry, the officers asked to search the defendant's belongings, found narcotics, and arrested the defendant. *Id*. at 284. The court granted the defendant's motion to suppress because the ruse "created a false sense of exigent circumstances" and was an extreme misrepresentation of investigatory purpose that deprived the defendant of his ability to assess the need to surrender his privacy. *Id*. at 291. Similarly, in *United States v. Giraldo*, 743 F. Supp. 152, 153 (E.D.N.Y. 1990), police officers gained entry to the defendant's apartment by claiming to be gas company workers checking for gas leaks. Upon entry, the officers identified themselves as police officers, asked for the defendant's identity, and obtained permission to search the apartment. *Id*. The officers arrested the defendant after finding narcotics. *Id*. The court granted the defendant's motion to suppress because the defendant's "'[c]onsent' was obtained by falsely inducing fear of an imminent life-threatening danger." *Id*. at 154.

Unlike the ruses in *Montes-Reyes* and *Giraldo*, however, the ruse that the agents employed here was innocuous. A search for a stolen cell phone is wholly distinguishable from a search for a missing child or an imminent gas explosion. Although the ruse misrepresented the true purpose of the agents' visit and capitalized on Monzon-Luna's desire to assist law enforcement, it did not create a false sense of exigent circumstances that deprived the defendant of his ability to assess the need to surrender his privacy. The agents here presented the most

9

innocuous of scenarios, and carried it out in a low-key way. This was hardly the type of ruse that would deprive an individual "of the ability to make a fair assessment of the need to surrender his privacy." *United States v. Montes-Reyes*, 547 F. Supp. 2d at 291; *see also United States v. Pollaro*, 733 F. Supp. 2d 364, 368–69 (E.D.N.Y. 2010) (finding that, even if search were represented as being related to "national security," "such circumstances would not rise to the level of the extreme deception required to render consent invalid."). [7]

**b. Conversations and Search of the Cell Phone and Notebook**

After the agents gained entry to defendant's room and indicated that they had failed to find the stolen cell phone, the defendant made voluntary statements, and provided consent for the agents to undertake each additional search that they conducted. The evidence adduced at the hearing demonstrated that the agents' interactions with defendant continued to be cordial and non-coercive, and constituted a congenial "back and forth" between police and citizen willing to help.

From the entry into the residence, to Kirwin's foray out the window, to questions regarding defendant's identity and the requests to view defendant's identification, phone and

---

[7] Citing to *Florida v. Jardines*, __ U.S. __, 133 S. Ct. 1409 (2013), Monzon-Luna argues that suppression is also warranted because the agents exceeded the scope of his consent in both purpose and location by searching and investigating a different area than they had stated initially. (*See* Def.'s 9/17/13 Ltr. (Doc. No. 130) at 6 (citing *Florida v. Jardines*, 133 S. Ct. 1409 (2013).) Monzon-Luna's argument is meritless. In *Jardines*, police officers used a drug sniffing dog on the defendant's porch in order to determine whether he was growing marijuana inside his home. There, the Court held that it was objectively unreasonable for the officers to believe they could conduct the search based on the implied license a visitor has to approach and knock on a front door. *See id.* at 1416–17. In this case, following their entry, the agents did not do anything akin to what the officers did in *Jardines*, and certainly did not begin searching Monzon-Luna's room at will. Rather, the agents sought and obtained Monzon-Luna's permission before initiating each additional search. Thus, notwithstanding the dicta that Monzon-Luna repeatedly cites, *see id.* at 1416 ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics."), it cannot be said that the agents exceeded the scope of the consent that they were given here. *See Garcia*, 56 F.3d at 423 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical person have understood by the exchange between the officer and the suspect?" (quotations omitted)). Indeed, to accept Monzon-Luna's argument would completely eviscerate the government's ability to conduct undercover operations in which its agents adopt fictitious identities and employ deception to mask their true motives.

notebook – the agents were solicitous and respectful of the defendant, asking his permission at each step along the way. They introduced themselves by name, shook the defendant's hand, and thanked the defendant for his help in assisting them with their "investigation." Indeed, as the evidence plainly demonstrated, the defendant was more than willing to help, pointing out the intricacies of the building's roof lines and clearing the windowsill to assist the agent to exit safely.

Moreover, the defendant volunteered his name as "Edwin," and when the agents asked for further identification for their "report," it was the defendant who first voluntarily provided the identification document in a different name, and then provided his cell phone to give further corroboration of his contact information. Upon learning the contradictory information, the agents followed up on defendant's identity, as they are entitled to do, *see* 8 U.S.C. § 1357(a), but again downplayed the defendant's answers, suggesting that his status would not matter to the "police" and in order to ensure that the defendant did not suspect the true focus of their inquiry. *See Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998) (approving admissibility of statements obtained through trickery and deception). Most important, as the uncontroverted testimony showed, Kirwin expressly asked the defendant for consent to look through the 516-phone and the notebook, and the defendant expressly agreed.

Thus, under the totality of these circumstances, it was objectively reasonable for the agents to believe that defendant had consented to discuss his immigration status with the agents and to search the 516-phone and the notebook. *See United States v. Garcia*, 56 F.3d at 423; *United State v. Pollaro*, 733 F. Supp. 2d at 1334-35.

### c. Post-Arrest Statements and Consent to Search the Cell Phones

Similarly, there is no basis to suppress defendant's post-arrest statements or the evidence gathered from the post-arrest searches of the 516-phone and the 203-phone. As the uncontroverted testimony of Agents Tirado, Hernandez and Kolovich plainly demonstrated, before any questioning, defendant was apprised of his *Miranda* rights in Spanish by a qualified Spanish-speaking officer. He clearly indicated his understanding of these rights and executed a written waiver of those rights. During the interrogation, he was not handcuffed and he was provided with water. Furthermore, Kolovich, Tirado and Hernandez all denied making any representations to the defendant that he would be released if he cooperated. Thus, defendant's waiver of his *Miranda* rights was knowing and voluntary. *See United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013) ("In determining whether a defendant's waiver was valid, we ask whether the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." (quotations omitted)). Thus, all of defendant's statements made at the HSI offices are admissible, including his statements about his identity, nationality and immigration status, and his admissions regarding the ownership the cell phones.

In addition, the evidence also demonstrates that defendant voluntarily consented to the searches of *both* the 516-phone and the 203-phone. Kolovich, Tirado and Hernandez all testified that defendant was able to provide the phone number for the 516-phone, but not for the 203-phone. At that point, as the agents all explained, Hernandez left the room, retrieved the two phones at issue, and placed them in front of the defendant. And most important, as Kolovich, Tirado and Hernandez all unequivocally testified, the defendant was asked, and the defendant, in fact, gave his consent for the agents to search *both* phones. Hernandez then left the room to

conduct the search and analysis. Moreover, as Kolovich and Hernandez testified, had there been any doubt as to the defendant's consent, they would have obtained a search warrant. [8]

It is true that the written consent to search form lists only one phone – the 516-phone. While that omission gives reason for pause, it does not prove to be fatal. The issue before the Court does not rise or fall on the agents' paperwork. Rather, "the ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia*, 56 F.3d at 423 (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334-45 (8th Cir. 1994)). Here, this Court finds credible the unequivocal and uncontroverted testimony of agents Kolovich, Tirado and Hernandez, each of whom testified that the defendant gave his oral consent to search both phones. This alone is sufficient to establish the agents' reasonable belief that they had consent to search. And as Tirado and Hernandez credibly explained, the 203-phone was not included on the written consent because the defendant himself provided no identifying information about that phone, and adding that phone would require adding information that did not come directly from the defendant. Accordingly, this Court finds that the defendant knowingly and voluntarily consented to the search of both the 516- and 203- phones.

---

[8] Although the Court finds all searches of the 516- and 203-phones to pass constitutional muster, evidence obtained from those searches, conducted both in the defendant's residence and post-arrest, would also be admissible under the doctrine of "inevitable discovery." *See United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) ("Evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation.") Here, the Court "has a high level of confidence that [a] warrant in fact would have issued and the specific evidence in question would have been obtained by lawful means." *See id.; see also United States v. Whitehorn*, 829 F. 2d 1225, 1230 (2d Cir. 1987) (admitting evidence if the prosecution can be established by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means" (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Here, the information supporting probable cause for the GPS tracking warrants of the subject phones coupled with the information lawfully obtained during the events leading to the defendant's arrest gives this Court a high level of confidence that the government could have obtained warrants to search the two phones at issue.

## CONCLUSION

For the reasons stated above, and briefly put, the agents' use of the ruse to gain entry to Monzon-Luna's room was lawful. Based on the totality of the circumstances, it was objectively reasonable for the officers to conclude that the defendant voluntarily consented to their entry and the subsequent searches that they conducted. Following his arrest, the record indicates that Monzon-Luna knowingly and voluntarily waived his *Miranda* rights and agreed to answer the agents' questions. Finally, the record shows that Monzon-Luna orally consented to the search of both the 516- and the 203- phones. Accordingly, Monzon-Luna's motion to suppress is denied in all respects.

SO ORDERED.

Dated: Brooklyn, New York
November 22, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge